Good morning. Today we will hear the case 2023-40605, Texas Medical Association et al. v. United States Department of Health and Human Services et al. We will hear first from Mr. Soter. Thank you. Good morning. Command Chief of the Court, Kevin Soter from the Department of Justice for the government. At the outset, I think it might be helpful if we could take about three minutes to address both the merits and early data. On the merits, to protect patients from ruinous surprise medical bills, Congress enacted the Surprise Act. It required three government agencies, the defendants here, to issue regulations selecting optimal details of the methodology that could be used to calculate the Qualified Payment Amount, or QPA. The figure that Congress devised was kind of a proxy for the in-network cost of the medical services with this bill. And for patients, the QPA can determine the cost-sharing responsibility, meaning a comment saying, oh, in terms of co-pay, or in terms of independent document. For reservers, Congress decided that there would be a negotiation and arbitration process to determine how much they would pay to the providers. And, of course, for the medical providers, I guess here, their complication for getting services is how much they get from the insurers. Congress expected the agencies to use their correctly delegated authority to address some of the complexities that could come up in the world of Mexico, and to account for the potentially conflicting interests of patients, insurers, and providers. Plaintiffs take issue with three details of the regulations that the departments issued, presuming that that were a mandate. But plaintiffs' arguments block isolated words from facts, deprive them of context, and then judge that there is facts on which they rely. Not to mention that this was the most harsh purpose of weighing in increasing health care costs to patients and consumers, as we have a history of having patients and consumers have issues with, and they should point to our costs. On the remedial issue, in Trump v. Trump, the Supreme Court recently put a stop to the practice of reflexive universal injunctions, with many district courts, it formed a habit of ensuring a narrow focus in case-involving injunctions. This case presents the related question whether the Administrative Procedure Act created the functionally similar remedy of authorizing every district court in the country to purport to erase regulations universally. The practical problems with universal vacater are similar, and as Justice Gorsuch recognized in his concurrence in the United States v. Texas, there are powerful reasons to think that the best interpretation of the statute Congress actually enacted in 1846 did not upend centuries of tradition regarding party-centered policies. As we explained in our briefing, we take a fresh look at the ACA and all the standard tools of statutory interpretation. The best reading is that Congress didn't create a new system of vacater. But even if it did, Congress certainly did not speak clearly enough to create a system where every district judge in the country is supposed to grant relief to non-parties by default and consider more limited relief only in exceptional circumstances. That gets to the false exacting documents. I welcome your questions. I'm happy to start on the merits forms that are created. So the first one on the question of what race is supposed to be included in the so-called close race issue. I think the text of the statute is quite clear when you look at the phrase as a whole, that Congress did not plan to create a distinct requirement that insurers are populated as a number whether they came to look to be claimed or paid or to be services that are performed over some statute or they need to not be deteriorated. I guess they're asking you to read into the single word provided. When you zoom out and look at the phrase as a whole that it's used in, and this is back in page 3 of the Addendum to the Government's Opening Bureaucratic Language of the Statute, you'll see just that particular part says, that is provided by a provider in the same or similar suffragette and provided in the geographic region in which the item of service is earned. It's consistent with the methodology established by the statutory. And provided by the provider is quite naturally linked to the limitation that appear right after that, the geographic region in the same or similar suffragette, to the thing that you gave that you're supposed to deal with, which is the convenience of contracted rates. I don't think that Congress was saying that when you're looking for rates that an insurer has negotiated in advance, you're not supposed to negotiate with the providers, you're supposed to exclude certain negotiators, and you're supposed to group them. Mr. Sutter, can you reconcile your reading that provided means make available with your 2022 FAQ that states that the QPA may include contracted rates for other services a provider does not provide? So that was, I think, talking about how the same sort of establishment formulation works, and I think some unclear things in that can't override the fact that the statute is not calling for a kind of D40 that the banks are asking for. There's nothing in the statute that tells you you're supposed to go and look at historical data about when a particular service was in fact furnished, which is one of the things you would need to do in order to assess the verity of the statute. So I know there's a number of stipulations there, but instead of that, this point is entirely consistent with the regulations, which is when you have, for example, if you come across a contract where an anesthesiologist disagrees for all general thoracic services, you're not going to end up calculating a QPA for general thoracic services by your oncologist, but it includes that, because you're doing it separately by specialty. And that's the problem we're getting across. Well, counsel, even doing it by specialty creates situations. Amicus Briefs mentioned it, plaintiffs mentioned it in their briefing. But you have broad specialties, OB-GYN, orthopedists, others, who don't actually provide all OB-GYN services, never would, don't provide all orthopedic services, never would. It's not that the statute doesn't have language that says you have to look at historical data, other than the word provided. And so, if that service provider does not provide half OB-GYN services, half orthopedic services, just looking at it in terms of specialties wouldn't take care of the problem, if the argument is correct factually, that a specialist wouldn't worry about service codes, service levels that they don't provide, and those contract rates may be artificially low. They wouldn't be zero, because you've taken care of that, but they may be artificially low. Is that a factual issue of whether that actually has happened, or are you strictly rejecting that as a matter of statistical interpretation? I think the question is one of statistical interpretation, and it's whether an over-reported situation you're not always talking about can come up. You would have to have a situation where a provider has agreed with the contract rate for a particular service that is within that provider's specialty, but is nonetheless not a service that that provider somehow subjectively expects to perform over some unclear period. And I think what Congress was imagining in the session when it tied it back to contracted rates, the median of the contracted rates under the plan, was that you would be able to look at the four corners of the plan and tell from that, okay, this provider has agreed to accept this rate for this service. That's going to be the rate that you use for the QPA to determine how much the patient pays. But then Congress determined that's not going to necessarily be the only thing that drives up the provider benefit. It's created an entire arbitration and negotiation scheme where a provider can come in and say, that amount is not reflective of the value of these particular services. I'm happy to move on to the second merits issue. Just to clarify on the first, is your argument against including what are called ghost rates in the QPA, some or all of the following, that they are provided as in they're available? They are provided because they're on the fee scale that everybody can negotiate, dispute, and remove? And or is it because the statutory regime understands that the providers have the best knowledge, incentive, and time to challenge them? I think it's all three of those. No, this is looking to rates that were agreed to in the past before the notice of privatization. I think Congress was concerned about the incentive to create, if you could come up with these contracts after a statute, I think one statutory clue that's very helpful for all of these ones, we haven't talked about that, is that the statute says to look at contracted rates recognized on January 31, 2019. And I think that makes it quite clear, what Congress had in mind wasn't exactly what Congress did. It was just to say, insurers, go look at all of your planned contracts, who does the population line them up, look at a set of things in the geographic region, and then pick the median of that. And as America's Health Insurance Plans, that process, which Congress built in six months' worth, already costs a million dollars for an insurer to actually do that, adding up to about $1.7 billion total. And the thing is, if you're asking to apply your best calculation, I think it would be done in a way that those same techniques are found, it's potentially not possible to do at all, or something that would be more expensive. And so, moving on to the bonus and incentive value-based payment issue. I think there, too, it's helpful to look at the interest rates from the insurers that explain better than I could how this actually works in practice. But the basic idea of this part of the regulation is that the types of payments that the providers are asking you to pay need to be included in the PPA are rarely actually tied to this particular service. So, when we're talking about the median of the rates contracted on a fee-for-service basis, these are generally not normally fee-for-service payments. And what Congress did, they recognized there are all these new factors, and they recognized that there are all these new features, and left it respectively to departments to figure out how that works. And what Congress did was they came up with a methodology where they said, okay, if you have some fee-for-service rate table, even when you have some other ways of paying for mobile payments, those type of fee-for-service rate tables, if you don't have that, then you have a funding methodology to do some tax purposes or something to do that. What it didn't say was include these separate, often after the fact, on some bonus payments, which makes sense, but it also says you don't include the counterparts to that, which is common sense. I think, fundamentally, what the plaintiffs are asking you to do is to read this statute as if it says that the TPA is supposed to treat each provider as the best possible provider in all of these aspects of their claim, rather than as the provider that gets. May I ask you a question about the language of this provision? There are two sentences. The first one says, and this is the one the athletes focus on, such rulemaking shall take into account payments made by such plan that are not on a fee-for-service basis. The next sentence says, such methodology, which is referring back to the methodology to determine the QPA, such methodology may account for relevant payment adjustments regarding account quality or facility type. What is the interaction of those two sentences? The first one, I think, is a little more direct. It's what we're talking about here, which is where Congress was saying the methodology was developed under this rulemaking. I'm not trying to figure out some way, and Congress, not that the Congress is trying to figure out that way, but dealing with fee-for-service or non-fee-for-service arrangements in general. That second sentence, I think, was helping, was sort of to add that Congress wanted to give particular discretion in this area of, essentially, low income and rural type. I think so. But those are more on a facility basis. And here we're talking about payments for providers, so that does get back to the problem that Congress recognized when drafting this rule is that a lot of these bonuses, benefits, and additions to being lost funds that are either an addition or a penalty on the back end aren't just going to correspond in any particular way to a service from a particular provider to a particular patient because they may be meaning to the facility. This is, I mean, this is sort of my problem with the appellant's argument, and I'm really, I'm not taking a position at this point. But did this law contemplate using a snapshot of January 31, 2019? Yes. And that being the case, under the appellant's reasoning, you'd look at any provision for retrospective payments, you know, non-fee-for-service payments. Is that right? So you'd look at the kind of contracts that existed on that date, and you'd look to see what is this fee-for-service that's been agreed to for this particular service. In a standard fee-for-service arrangement, that would be fairly straightforward. In one of these more complicated situations, the department has explained that you have to do this thing where you figure out either there might be a fee-for-service table in there and that's, you know, the provider is being paid in some different way. There might also be, in fact, a survey kind of methodology that's used. But none of that ties a particular bonus incentive or penalty payment to a given medical service. And I think Congress was looking to understand or to give a starting point for the, I'm sorry, a determinant point for what the case was made, and a piece of the puzzle in what we're sure was made. It wanted this sense of a dominion in that approach, and it doesn't make sense to say that a dominion in that approach is determined by assuming that every single provider would be the best possible version of performing under that. Counsel, there are arguments in the briefing that the panel gave too much discretion to the agency, and to some extent we're talking about that now. This is complicated business. How are these contracts actually formulated? To what extent can you defend what the panel held, which I'm not sure need, you know, defending here, we need to work with it, under Loper Bright. To what extent was it a Chevron decision with a bow towards Loper Bright? It seems to me you're really arguing here that for us to interpret in the way that plaintiffs want us to interpret what provided means would require enormous expense getting beyond proper interpretation of the word provided. But I think you are bleeding into really saying that we need to rely on the discretion of the departments to tell us that this is too hard if we interpret provided in a way that arguably is a better interpretation, which you'd have to look at whether that provider is actually going to ever make that service available. So I think, of course, the panel did have the benefit of Loper Bright in explaining why this reasoning was consistent with Loper Bright, and what the Supreme Court would make clear in that case, as well as the possible cases we cite in the Bruce Satterthorne case, is that the court's role is certainly to decide the statutory appropriation questions for itself and to fix the balance of an agency's authority and ensure that it's active within those bounds. But there are going to be many situations, including the one in the Draft of the Seventh County case, where the dispute comes down to what the plaintiff is trying to say is that the agency didn't engage in reasoned decision-making within those bounds or did something that's not a reasonable use of its discretion. And so on the second issue that we were just talking about, I think there are those who recognize that the statute was not clearly precluding doing a fee-for-service appropriation, but actually looking at the error and contrast technology between the fee-for-service and then leaving it to the department to fill out the details of the non-fee-for-service arrangements. I think that is a helpful framework for thinking about that issue. On the provided issue that John was talking about, certainly it's the court's role to give meaning to the statute, but I think when you look at the statutory provision as a whole and the context and the purpose that it's serving in the statute, it's just really not general to come away with the conclusion that Congress is hiding within this one word, provided, an unceded requirement that you will look to whether providers have permanent services over some period that is, again, not stated anywhere in the statute. I think it's kind of unusual to hear anything under the plaintiff's view. I'm a little bit more worried about what I would be saying if you could have gotten a rule that the plaintiffs are asking for because we would be talking about a hypothetical ruling involving some unceded statutory period of errors and these are made up under which services are permanent. And I think that is a further part of the statute. Well, and I want to note, I do think Loper-Bright makes it clear that the Congress may be giving the agency very little or quite a bit of discretion from statute to statute. Is that your understanding as well? Yes. And isn't it your understanding that this one does give a fair amount of discretion, which is different from maybe some other statute that Congress may pass? Yes, and it's different from other parts of the statute. As the panel recently explained, there is a difference between the arguments that we were making at the panel stage about the QPA methodology, where Congress did agree to build this in the hands of the Department, quite clearly saying the Department shall establish a methodology and the statutory definition of the QPA says it has to be consistent with the methodology developed by the Department. I think that is a wider range of latitude than some of the other issues that have come up in this litigation. And of course, the panel resolved a different issue on that basis as well. So we're in direct review, of course, of the district court judgment now that there's no panel opinion. What is your wish list in terms, as the appellate, in terms of specifically what you're asking us to do in regard to the district court's judgment? So as we set out in our review, I think on the merits, there are three things that stand out to this court's judgment, all of which involve the QPA calculations, and it's reversing the district court's judgment on all three of the QPA calculations, issues addressed in our opening brief. The third of which, which we haven't talked about yet, is the Air Ambulance Provider argument that while out-of-network probation is supposed to be included in this calculation of the immediately networked rate, that line of the court has to address even though no further review was done on that issue because the panel opinion has been vacated in the review of this court judgment that has set aside that portion of the regulations. And then on revenue, which I'm happy to talk about later, I think the court's role is to determine what revenue will be appropriate for any provisions that are left unlawful after the court's disposition of the merits, which involves revenue for both the issues that we're not here talking about the merits of, as well as the court rules against us on the merits of any of these QPA calculation issues the court will necessarily have to reach the question of what revenue is authorized by a particular procedure act, as well as how will the employees look justified for the remainder of this report. We've got regard to remedy. You know, this court has stated as recently as 2023 en banc in the Cargill case that universal vacatur is the APA's default remedy. But you're asking us to do something different and I have a follow-up question. What other remedy could redress petitioner's injuries given that insurers are not parties here and it's reminiscent of the corner post concurrence that Justice Kavadaugh has written. Can you elaborate on that in some place? Of course. So first on Cargill, I think what the court said in Cargill was that the remedial scope issue was not very fair and so the court thought it was going to redress it. Of course, this is a different situation where you have full written information that would be on the remedial scope question. On what sort of remedial would be possible here, I think we're just asking the court to ensure that this report is asking the right question. We're not asking the court to resolve the question in the case in the first instance. And the right question to be asking is what equitable remedy would be appropriate to redress these plaintiff's injuries in a manner consistent with the tradition of equity in this country. And our submission is that the APA did not patent a radical report from the Commission of Equity in the Supreme Court just explaining the immense cost of this issue. I think Justice Forster's concurrence in J versus Texas really spelled out how these are of a piece with each other. And of course, he was joined there by two other justices. There is this ongoing discussion among the Supreme Court justices and we're just asking the courts to take a careful look at the tax structure and tax history of the APA and resolve these two important questions. One, whether this area is enough for us or not at all. And two, even if it is, keep in mind how you would evaluate whether it's good or poor. Counsel, related to that, just with diminishing time left, if you don't prevail statutorily, are you asking us to remand without thinking? Sure. And if you are, what's the best case that explains when a court does that for the nation as distinct from issuing a universal factor? If the decision you're going to describe to me keys it on disruption, does this record show that striking the QPA calculations will be disruptive to Americans? Yes, it does show that. And I think, as we've talked about, I think the cost of recalculating the QPAs would exceed $1.7 billion. And as the administrative record and the rulemaking makes clear... Do you have a SIR record site, or is that... It's in the brief? That's... I mean, the insurers are the ones who are calculating that for the America's Health Insurance Plan. And in this brief, and I think they have it at a sense, that they estimated that the first time around, it costs about $1 million per insurer. And when you have that... And just quickly, what's the best case? I know several that we have chosen to do remand without vacatur. Other circuits have, too. Of course, we have authority to issue a universal vacatur. What's the best circuit decision that explains when a court will choose one or the other? I think this court's decisions that we've asked the court to take a closer look at are the way that all rules work. I think it's a self-questioning decision to explain the factors that the court looks at, but I just wanted to make that our submission here is that we shouldn't supply the court thumb-on-scale in favor of universal vacatur. That's putting thumb-on-scale in favor of the factors that the case court just said is a problem in a very similar context as universal vacatur. If a vacatur were granted, what would be the practical consequences for ongoing payment of out-of-network providers? So if the district court's decision were affirmed under the merits in the remand, I think we would then be in a world where some of these regulations have apparently been erased, even though there is no history of any regulations or any statutes that define them are constitutional. I understand that. I'm asking practically speaking. And I think practically speaking, insurers will have to go back and figure out how the cost of a CPA is consistent with what remains of the regulations. And departments will have to figure out whether new regulations are necessary. So, in other words, payments to providers might well have to be suspended pending the recapitulation or the reissuance of the rule and then the recalculations. So what's been happening is that departments have exercised their enforcing discretion to say insurers are supposed to calculate a CPA consistent with the methodology established by regulation. The government has enforced their authority or they are not doing that. And the government has recognized that it might have cost them time in order for them to recalculate this number and the uncertainty of surrounding this location. For the time being, insurers can continue using the numbers that they calculated under the original methodology as their final decision. Making clear that that original methodology is not common sense. There will be a different discussion about that in the next. Alright. Thank you. Thank you. Take safe time for rebuttal. Thank you. May it please the Court. I am Jillian Josepher on behalf of LA's Texas Medical Association, Tyler Regional Hospital and Dr. Adam Forley. I will be speaking to the providers in total maximum issues along with remedial issues and Mr. Strauss will speak to the separate subcommittee                The determinants have no discretion to craft a methodology that is inconsistent with the text of the no-supporting facts that should not be enacted. It even holds authority to enact a methodology that is inconsistent with the text in ways that will forever depress CPAs below negotiated market rates, resulting in inadequate compensation for emergency and other survivors.           That's not what Congress did when the text was enacted and has always been the case and it's even more clear after local rights Congress has to say within the statute. The department has to say within the statute always after. The department has tried to complicate issues here largely by raising administrative concerns. But administrative inconvenience can never override claimed statutory facts. It's of great importance that exactly that reason is made important. Even if it could, even if administrative concerns were at play here and had a role in our statutory interpretation, the administrative inconvenience caused by these incorrectly calculated CPAs vastly outweighs any inconvenience in taking the time to get the CPAs involved. This is a statute that will affect provider compensation forever and it was reasonable for Congress to require the work to exclude junk rates and to include negotiated foregoing bonuses. Judge Pernod will recognize that the statutory facts here are simple and so are the department's violations. So what are those violations? First, as to provided, the NSA said twice that every rate that goes into a CPA calculation has to be for an item of service provided. Provided by providing the examiner's specialty and provided in the geographic region. The departments want to read that term out. But they've told insurers that when they calculate CPAs they should include rates for items of service that quote providers do not provide. The government is here to say that that's unfair language but it's not unfair. It's not unfair. That's what they have said and the guidance states that it's binding on insurance. And there's no dispute that under that guidance insurers are calculating CPAs to include rates for items and services that providers cannot, would not and are not even equipped to furnish each. Under the plain meaning of provided, that's the guidance. Second, on total maximum, the NSA commands that every rate that goes in must be the total maximum payment under the contract for an item of service. But the departments are telling insurers they have to subtract. Calculate your contracted rates they say and then subtract,  any amount from the incentive rate. The departments are here saying well not all bonuses are for items of service but that's really because their rule tells them always whether or not the bonus is for an item of service that's contrary to the text of the NSA. Third, even if Congress has not been clear here in the text that it chose, it was arbitrary and capricious for the departments to enact rules that express CPA use rights without the luxury of knowledge and ability. An important aspect of the problem always addressed in the NSA was adequate provider compensation which makes sense because they radically change the  in which these providers operate. It is not rational to require insurers to exclude negotiated bonuses and to tell insurers to increase job rates meaningless if they can generate some QPA compilations without having to address any rules that provide compensation. Finally, departments invite the courts to detour from well-reasoned precedent on remedying underage debt. There is no reason for the courts to provide anything here. Even today, one of you asked the departments what is the remedy? As you proposed, the  don't have one. It would be unfair to the media to suggest for no one to consider something the  never said before. Any  questions? Counselor, I have a question about any posit that the only problem with the methodology once you eliminate zero rates in the contract, once you  specialties other than the specialty that you're focused on, if those rates are different than the specialty. Excuse me, your argument is that an awful lot of these specialties will have in their contracts rates for things that are never provided. I don't think it was your brief, but one of the countries did some data,  I don't know if it's the study, whatever it was, 50 some odd percent, 60 some odd percent of providers in certain districts may only provide a certain service twice, where twice is enough. It's provided. So it seems to me that the premise for your question, for your position, is that if in fact the only problem is, and you don't have to acknowledge it, just go with me on this, if the only problem is at the specialty level the contracts will include rates for things that that plan will never actually pay for because that specialist will never provide them, what is the evidence to support that that the rates in those contracts are in fact not negotiated in some way or are artificially low, they can't be zero because they would be limited for that basis. What would we go on to cause what I think everybody would acknowledge, and you can tell me otherwise, is going to be a very disruptive situation if we vacate this methodology. What would satisfy the court if the judge has only that problem with the methodology, that this actually is a problem? There is evidence in the record that this is a problem. I think the best evidence is the FAQs themselves, so the department acknowledges that this is a common way in which insurance providers can provide   without regard to what the provider actually does. There are also declarations in the record from plaintiffs here talking about the fact that there are non-zero ghost rates that are appearing in contracts. But I think the main problem here is that reading famous numerous specialty to render the provided requirement meaningless doesn't work as a matter of statutory interpretation. Congress chose each word in this TPA definition and each word has meaning. It chose to require that the item of service be provided by a provider in a famous numerous specialty. And so it is not a correct reading of the statute to find famous and similar specialty alone addresses the rate of non-zero ghost rates    And        to find  and similar     And       statute and   I agree with you that some of the data is about that the Avalier study does also look at rates that  never provide as well as what they provide But to the extent that you're worried about sorry ask the question one more time. I think I lost track of what you were asking. I lost track too. I guess I think I'm picking up on that in your brief at page 12 you quote the QPA but you leave out entirely in the same or similar specialty so that's not a textual reading that's not clear and simple you leave it out entirely so I guess my question is once you put the language converse put back in it sounds like it's made available as to actually if you have to look to whether others in the same area in the same area same specialty that's not an actually provides that's others make it available so my trouble was in the brief you kept leaving it out entirely to argue it's provided by a provider but if you put it in it sounds like you have to look whether it is available by other providers I think you have to look to both because that's what the statute says and to be clear we're not arguing for a historically furnished text we think we clearly win under available it's available as a plain and easy to read this court discussed it and re-evaluated specialty utility district talked about when a service is made available the court found in that case a service is available if the provider if the person providing the service has it at hand able to provide it has the equipment to furnish that service itself the department rule is different they say any time a service appears in a contract it is available but that is not what available means just like in Green Valley Special Utility District how a legal obligation to provide a service didn't mean the service was actually available the fact that a rate appears in a contract does not mean that that service is actually available  makes sure that that's different provided it can't be in a contract because the Congress started the contract agreement but if they never provide the issue then the patient will never have to pay for it so I'm not understanding why if the  is never going to do X we need to worry about what X would cost well except that we think that they shouldn't worry about so but I mean why are you all worrying about it we're worrying about it because under the department's rule all of these rates for items and services that providers do not provide meaning do not make available at all are getting factored into the QPA calculation so the QPA is a median of a set of  and some of those rates undisputedly are junk rates they're rates that no one thought about no one negotiated insurance provides each well if there is some specific problem some specific entity has can't that entity deal with the agency I guess I'm just having trouble with why you all are going off on something that doesn't seem like it's likely to come up this comes up in every single page under the NFA because in every page of the QPA we have we have      QPA      it's  the main issue with all of this it is very important that the QPA approach the negotiation of the QPA that the insurer consult the insurer in private and secret and come forward. May I ask you a question about the January 31, 2019. One of the MECAS briefs pointed out that some services are provided on that date, some services are not. What is the point of taking a snapshot of contract and then trying to as I understand what you're saying apply these you know you may have one practice that does a certain kind of anesthesiology and really another I forget what the example head and neck or  but there's an item in the  for that but as of  31, 2019 there wasn't the word claims to that. So how do you how does an insurer how do you arrange a median based on the happenstance of what was occurring on January 31,  I think the significance of that data is that it identifies the relevant contract. So those are the contracts that issue those are the rates that we are starting with and then narrowing down. The provided requirement is a separate requirement that will require insurers to look outside the four corners of their agreements to determine whether that item or survey for which there was a rate in January 2019 is something that that provider provided as a new available furnish or supply at that time. Right but my understanding I mean again to get back to what I was talking about I just want to be maybe a little clearer my understanding on the provide is that you can provide it. Not that you have but that you can. So if you could not then it wouldn't be part of that in your entity right? Under the contract.  you're saying is that provide means that it can be provided not that it has been. No. They make clear that their view is that any time contracted rate appears in the contract that being available. That's because why would it be in the contract if you can't provide it? Because that's how it works. Because that's how it works to ensure provider contracting as the department recommends. In their FAQ they said in negotiating contract insurers currently or in 2019 they would come to a provider with a you know 20 page fee schedule every type of service they provide with their kind of opening offer. There are no rates that they would give that service. Providers negotiate just the rates that they provide and then they return the  There are tons of junk rates floating around out there that are not negotiated that are not negotiated market value insurers. Counsel, so just to I think Judge Haynes is the discussion you're having is really getting at the key to the case for me. Which is what you're saying is that if these so-called junk rates or ghost rates if they're included in the calculation then it's dragging down the QPA. That's why you don't like it. That's why your clients don't like it, right? It's dragging it down. Isn't that the point? That's exactly the point. Okay. That's what I thought. How do you handle if there are these rates dragging down? It's my understanding you argue while the  excluded any zero rates from the QPA, rates that are artificially low are still considered part of the calculation. That's your position. But how would you propose that the department determine that  are artificially low because it seems that would require the department to determine which rates each provider has negotiated with insurance companies and separate those from rates that haven't yet been  Is that right? Are you saying they have to go through each one and separate them out from rates that haven't yet been negotiated? I think that they do need to do their work to figure out whether something is provided. The statute that they have to   do you define provided? January 31, 2019, whatever year is coming by, 2019, a few months, what method? The statute gives the relevant time, that's January 2019. The departments are tasked with creating a methodology to give effect to that statute. So I think there are reasonable ways they could do this. One, for example, the department could set some kind of time period under which if there's data that an item or service was furnished, if there's claims data, that is enough the rate goes in. They can look at their own claims data from Blue Shields if they have data for 40% of Americans. If they still have questions about what rates were provided in that time period, they also have access to additional data. They go through a prevention process with every provider that they have a contract with. Well, that already exists, so that's not, I don't think that, well, but moving on, I mean, I do think what you're talking about in the statute, what you would like, is something that's going to be incredibly complex, and moving to the next issue, which is the non-fee rates that are frequently incorporated into these contracts. How do you apportion a bonus payment or a quality payment that is retrospective in nature back to providers of particular services? Yeah, so that's another administrability concern that the departments are raising and that they have representatives a lot of. I think in a lot of cases it's really easy. I'll give you an example  the contract is structured. In fact, their amicus that is supporting them points to their Blue Cross Blue  brief that discusses a report by the Healthcare Payment Learning Action Network. They say it doesn't show that anything is allocated on a fee-for-service baseline or they may receive a percent increase on all claims paid depending on whether they meet quality goals. So that's an adjustment on the basis of the contract to the fee-for-service rate. Does that benefit the patient if there's an adjustment, if there's retrospective adjustment? Will the patient get a rebate? Thank you. So the patient cost sharing here would be calculated based on the QPA based on 2019 data. I understand that, but what I'm saying is if the if the calculation of this I'm maybe I'm confused, but the calculation of the retrospective increase, was that something that went into the amount that a  was charged originally? If the person says that customarily, that's not the case. If the patient cost sharing amount is determined out of the overtime service, whereas the retrospective payment may be made later in the year. Congress didn't take any of that into account. It didn't make any of that matter. So basically the patient would be  more, and then the QPA for the physician would be higher? That's not necessarily the case. The patient cost sharing is kind of a complicated in different ways, depending on the plan that the patient has with their insurance. So that their cost sharing will be capped in the same way that it will be  under their plan, so if they have met their deductible, if they've reached their deductible  they've    So in many cases the QPA actually won't matter at all for what the patient is paying. In some cases, it may, including the bonus amount in the QPA, may result in them paying a slightly higher amount. Say they have a 10% co-insurance obligation, they would pay 10% of the QPA. So whatever amount the QPA can pre-charge as a  would,  pay that slightly higher amount. But Congress didn't say,  considered all of the issues and it didn't say that the amount that goes into these calculations is the total maximum that minimizes the patient's cost-sharing obligation. They said the total maximum, including all amounts that are paid by the insurance. Counselor, this dialogue moves me thinking to relief because when I went back to read the April 23 hearing, the attorney for TMA on this issue, the risk that Americans would end up getting hit hardest, did say, we think the departments could allow the  to continue using the existing QPAs until such time as necessary. And if you disagree with that statement made by the TMA attorney to the  court, do you disagree factually with the suggestion that the record would show this would be disruptive whether or not it would lead to higher cost-sharing by patients? I don't think that that's what the counsel for TMA meant to say, but this would be very disruptive for Americans. They think what he meant to say is that it would be  to not No, I'm just talking about relief. We think the departments could allow the insurers to continue using existing QPAs until such time as compliant QPAs can be recalculated. That sounds like don't vacate,  but don't vacate. Let them keep using the existence. Am I wrong? I think that's a different question. I think that the argument there is not that you should not remand without daycare, but that there will be a timely, orderly process in which insurers can recalculate. If you remand without daycare, there's no incentive that there is a vacate. There's no  for the departments to issue new rules for insurers to ever begin recalculating correct QPAs. That would be that. So we need the rules to be vacated so that  start using, start recalculating and start using correct QPAs. What's the interim rule before there is a recalculation? While the recalculation is ongoing, the departments can continue using their enforcement discretion. They've said already that they've extended it from February of next year to May of next August. We think that would be a reasonable time to allow for an orderly and non-destructive transition. We think that being in daycare just results in being in daycare. Are you suggesting a recalculation later, sort of a balancing of the books at some point? Is that the  The plan is that once assuming this court affirms Judge Creole's decision to vacate, the rule will be eliminated, the unlawful parts of the rule    Hopefully the departments will issue guidance to help them along in doing that the correct way. Issues on the rules will help them with their recalculation. If not,  will recalculate consistent with the statute. That has been a question I've heard raised a few times about the supposed $1.7 billion cost. There is no remedy that would not require a recalculation of the QPA. Even if there was some kind of claim specific remedy available, that would still require insurers to recalculate the cost of   If there is     would require insurers to recalculate the cost of the QPA. If there is no remedy available, that would require  insurers  recalculate the cost   QPA. If there is no remedy available,   require insurers  recalculate           the cost of  QPA. If there is no remedy available, require insurers recalculate the cost of  QPA. If there is no remedy available, require insurers recalculate the cost of QPA. If there is no remedy available, require               recalculate     If there is no remedy available, require insurers              recalculate     If    there is no remedy available, require       If there       recalculate         If there   remedy available, require insurers recalculate the cost of QPA. If        recalculate     If  there is no remedy available, require insurers recalculate the cost of QPA. If there  no remedy      cost       of QPA. If  is no remedy   insurers recalculate             recalculate     If there is no remedy available, require  recalculate     If there      insurers recalculate    QPA. If  there is          QPA. If there  no   require insurers recalculate   of QPA. If  is  no remedy available, require insurers recalculate     If   no remedy available, require insurers recalculate  cost of        QPA. If    remedy available, require insurers recalculate of QPA. If  is no remedy available, require insurers recalculate of QPA.       If there is no remedy    recalculate of QPA. If there is  remedy available, require insurers recalculate of  If       there is   available, require insurers            recalculate         require QPA. If there is no remedy available, require insurers recalculate of  If there is   available, require insurers recalculate   If there is no remedy available, require insurers recalculate of If there                        are no requirements for a service that they don't expect to  But that provider has a lot to perform it. And the point I think is that when insurers look through the   provider is equipped to furnish it, I have no idea how an  is supposed to figure out when they have the looking at the contract dated January 31, 2019 with a  for a specific requirement for a service that they don't expect to provide. I                know that the provider            although certified for OBGYN will not perform. I think plaintiffs are certain that that is very  likely   will be able to provide a service that they expect to provide. And I think     likely that they will be able to provide a service that  expect to  And I think that is very likely that they will  able to provide  service that   to their clients. And I think that is very likely that they will be able to provide a service that           they expect to provide. And I think that is very likely that they will be able to provide a service that they expect to     provide. And                                                       they